IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| PCM Leasing, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 50076 |
| | ) | |
| vs. | ) | |
| | ) | |
| BelGioioso Cheese, Inc., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendant. | ) | |

**ORDER**

  For the reasons stated below, the court denies without prejudice the motion [71] to strike the Oakley Affidavit and refers the matter to the magistrate judge for a determination, after granting the parties an opportunity to be heard, of the appropriate sanctions (which may include exclusion of Oakley's expert testimony) for the failure to disclose Oakley as an expert witness under Rule 37(c) for this Rule 26(a) violation. The magistrate judge should also rule on the other alleged discovery violations raised in defendant's motion to strike. The motion [42] for partial summary judgment is stricken without prejudice to re-filing after determination of the Rule 37(c) sanctions. Prior to the magistrate judge undertaking the foregoing, the parties are directed to contact Magistrate Judge Johnston on or before October 12, 2018 to arrange a settlement conference.

**STATEMENT-OPINION**

  Plaintiff, PCM Leasing, Inc. ("PCM"), an Illinois corporation with its principal place of business in Illinois, brings this action against BelGioioso Cheese, Inc. ("BelGioioso"), a Delaware corporation with its principal place of business in Wisconsin. The amount in controversy exceeds $75,000. Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). Count I alleges breach of contract for untimely termination and failure to return documentation and software. Count II alleges breach of contract for disclosing source code to a third party in violation of a contract provision requiring the source code to be kept confidential. Defendant filed a motion for partial summary judgment [42] seeking summary judgment as to the Count II claim. When it responded to defendant's motion, plaintiff offered the affidavit of Myron Oakley ("Oakley Affidavit") [51] to support plaintiff's LR56.1(b)(3)(A) responses to defendant's LR.56.1(a)(3) statement of facts and plaintiff's LR56.1(b)(3)(B) statement of additional facts requiring denial of summary judgment. Defendant moves [71] to strike the Oakley Affidavit.

  Myron Oakley is the owner and president of plaintiff. Plaintiff's primary product is a proprietary software producer payroll system called Total Milk Management ("TMM") used by

1

companies and cooperatives that purchase raw milk to make cheese and other dairy products. The parties entered into a "Software Service, Maintenance and Support Agreement" ("Agreement") effective as of September 23, 2003 for plaintiff to provide the TMM software and support services to defendant. Paragraph 17 of the Agreement provides:

> "SUPPORT PROVISION. Should PCM, or any subsequent party holding title to Total Milk Management, be unable or unwilling to provide continuing support for the Total Milk Management system, upon written request, PCM, or the subsequent party, shall provide access to the Total Milk Management source code at no cost to BelGioioso, BelGioioso would agree to keep such source code strictly confidential. PCM, or the subsequent party, shall be entitled to any damages they may assess should this confidentiality be breached."

Plaintiff contends defendant breached this provision by hacking plaintiff's password protection and sharing the data file containing plaintiff's source code with a third party, Data Specialists, Inc. ("DSI"), plaintiff's competitor, when defendant terminated the Agreement and entered a new contract with DSI. Defendant denies it breached this provision of the Agreement. Defendant maintains it merely copied and pasted its own confidential information from the user interface component of the TMM database into a spreadsheet so it could be uploaded into the system DSI would be providing.

The TMM software was a Microsoft Access application that consisted of three primary software components, including the main application, a custom application and a database that housed defendant's producer and vendor information. The main application and custom application are encrypted and password-protected files which contain source code; business logic; and business flow, functions and formulas. The database contained defendant's confidential and proprietary information about its producers (milk suppliers) and each producer's vendors. This information included the identity of each producer, the producer's tax identification numbers, bank account numbers, loan numbers, etc., along with similar information for each producer's vendors.

On or about February 22, 2012, defendant entered a contract with DSI for DSI to provide defendant a license to use DSI's producer payroll software package, Dairy & Food Tracker Software Suite. While defendant was working through the conversion to the DSI software, defendant continued to pay plaintiff the monthly support services fees for the TMM software program. During this time, defendant had full access to the TMM database, including access to copy its own confidential and proprietary producer and vendor data. That much is undisputed.

Defendant states that beginning in March 2012, its employee keyed producer and vendor data into Excel spreadsheets that DSI created and e-mailed to defendant on March 8, 2012. DSI created the Excel spreadsheet to allow defendant to compile the necessary information for the conversion to the DSI program in a manner that would allow DSI to import easily the producer and vendor data into the DSI software package. The spreadsheet included separate columns for

each piece of data that would need to be imported. In order to populate the Excel spreadsheets with the necessary producer and vendor information, defendant's employee, Danielle Kozelek, copied each piece of data from the individual fields (a/k/a cells) contained in the user interface component of the TMM database (e.g., producer name, and payee; producer identification number; producer address; producer tax identification number; producer phone numbers) and pasted this data into the new spreadsheet. As defendant completed filling the necessary data into the Excel spreadsheets, it would e-mail the spreadsheets to DSI who would then import the data from the populated spreadsheet into the DSI software package. Defendant was able to copy its own producer and vendor data by using the interface component of the TMM database. Defendant never broke through plaintiff's encryption or otherwise accessed source code within the TMM software.

Plaintiff disputes the facts set forth in the previous paragraph. It argues, based on the Oakley Affidavit, that defendant could not have copied and pasted the information but must have accessed plaintiff's source code and transferred it to DSI. The Oakley affidavit contains the following statements:

"9. The proprietary source code to TMM 10 is contained in password protected database file, titled, Bg.mdb. The file is password protected to keep anyone from invading the file and removing the data or source code, thus protecting my intellectual property."

"12. As a platform for commercial application development, the Microsoft Access development environment provided two methods for safeguarding of the intellectual property of the creator of the application through password protection. The first method was to protect the coding of the main application. The developer would create user screens, queries, and code modules while running in the default developmental environment. The second method involved the actual database that contains the customer's specific data. This is where the Total Milk Management's application data is stored. This file must be an .mdb type, however, the MS Access development environment provides the application developer to create (sic) a password to protect viewing internal design, coding, and structures. This is the file named Bg.mdb."

"13. The TMM 10 Application is designed with an application module, PCMLI_10.mde, and a database container, Bg.mdb. The application module is compiled, encryted, and locked to guard against anyone freely viewing the design or code. The Bg.mdb database file contained a data structure design that was the core of the application. This source code is the intellectual property of PCM which it sought to highly protect and preserve with a cryptic password."

"14. The TMM 10 Bg.mdb database container is password protected to preserve the database design and code. The database container can be accessed through a password or otherwise breached or defeated (hacked) allowing access to the Bg.mdb data file which will open in "developmental mode" with access to the database design and code."

"15. Once the TMM 10 Bg.mdb database is opened, the BelGioioso Patron and Vendor

Lists can be easily accessed. Additionally, the internal field names are available for every table in"developmental mode." A datasheet view, will show all table data with the column headings of the internal field names. Finally, all the proprietary table relationships which are unique to the developer's design are accessible."

"16.  Once the TMM 10 Bg.mdb database has been opened in 'developmental mode,' you can export tables to an Excel Spreadsheet. Once the data is downloaded to an Excel Spreadsheet it can be copied to another spreadsheet for importation into a competitor's software application."

"17.  Defendant's statements that they never compromised the password protection of Bg.mdb (easily exporting its contents), but rather they 'cut and pasted' data from the screen user interface into thousands of vacant cells is highly implausible. The spreadsheets provided to PCM through discovery are populated with data that could not be accessed without first opening the Bg.mdb database."

"18.  An individual performing data input in the TMM 10 Application would not have access to the internal information contained in the TMM 10 Bg.mdb database. The field names in the user screens would not match the internal field names. Logical User Fields requiring only a checked box would be shown as true or false on the internal database. The Producer password, (PTW password) would not be shown on the user screen, just a series of asterisks to encrypt the password, after entered by the Producer. However, the full and complete password would be stored in the TMM Bg.mdb database."

"19.  It is impossible for an individual to 'copy and paste' the Producer Password from a user interface screen as it would only show as a series of asterisks. A password field will not permit itself to be copied and pasted."

"20.  Upon receiving the DSI Spreadsheets, I performed a cell by cell comparison of the DSI Master Patron Spreadsheet with the TMM Bg.mdb database, using an Excel Macro Function program. 12,365 cells contained in the Master Patron Spreadsheet were compared with data contained in the Bg.mdb data base. The redacted spreadsheet cells were not compared.  Of the 12,365 cells, all cells matched, save 11."

"21. The spreadsheet obtained through discovery from the defendant and labeled, Copy of Master Patron Spreadsheet.xlsx, (see Ex. 10,11) has several clear and distinct features evidencing that the Bg.mdb database was invaded and exported to a spreadsheet:

> a. Rows 1-11 (Row 1 highlighted) appear to be instructions from DSI regarding instructions as to what data was required for their application. (Ex. 10,11).

b. This spreadsheet contained approximately 75 column headings (field names) in Row 13 that are the exact cryptic field names authored by the plaintiff and used in the programming of the TMM 10 Software. These field names could only be obtained by defeating the password protection to the Bg.mdb database. (Ex. 10,11).

c. Row 13 is "grey highlighted" per the standard export from an Access table. (Ex. 10,11).

d. 12,624 cells out of 12635 cells in the spreadsheet labeled, Copy of Master Patron Spreadsheet.xlsx, matched exactly to the "export" of the TMM 10 tbl_PP_Patron_Master contained in Bg.mdb.

e. One particular field of the DSI Spreadsheet contained producer's passwords. These passwords were not available to a person using the software's interface component. The table column PTW_Pass, producer password, cannot be "copied and pasted" from the main user application as the user would only see cryptic asterisks, not capable of being copied and pasted. Yet, the DSI Spreadsheet contained an entire column of producer passwords which could only be obtained by defeating password protection and gaining access to the Bg.mdb data file. (Ex. 11).

f. Many additional or obselete fields are contained in the spreadsheet that were not requested or needed in the conversion to DSI. These include, but not limited to, CI through CS. (Ex. 11)."

"22. Based upon the above findings contained in paragraph 21 of this affidavit, either the defendant or its agents, wrongfully hacked or otherwise defeated the password protection to plaintiff's source code, opened the file, and made its contents available to DSI."

Defendant moves to strike the Oakley Affidavit arguing that it contains information that was not identified or disclosed as required by Fed. R. Civ. P. 26(a) nor provided in any supplement as required by Fed. R. Civ. P. 26(e), nor in the course of discovery and that it contains expert testimony and opinion though Mr. Oakley was never disclosed as an expert witness. Plaintiff responds that its Rule 26(a)(1) disclosures identified Oakley as someone who "has knowledge regarding all aspects of the contract and the provisions regarding the software procedures to be followed upon the termination of the contract." It also argues the Oakley Affidavit does not render any expert opinions "but merely states what he has observed regarding defendant's disclosures and how this evidence relates to his personal perceptions and observations." Plaintiff contends, therefore, that Oakley "is acting as a Rule 701 Lay Witness, not as a Rule 702 Expert Witness."

Fed. R. Evid. 701 provides: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Fed. R. Evid. 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

Rule 701 makes clear that "lay opinion testimony is limited to those observations of a lay witness that are not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002) (quotation marks and citation omitted). Rule 701 is intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Id.

"Lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field. As such, lay testimony is not admissible when the witness's reasoning process is not that of an average person in everyday life but, rather, relies on the witness's considerable specialized training, experience, and knowledge. Stated another way, lay testimony cannot make connections for the jury based on the witness's expertise. That means lay testimony is not admissible to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." S.E.C. v. Nutmeg Group, LLC, No. 09-cv-1775, 2017 WL 1545721, *12 (N.D. Ill. Apr. 4, 2017) (quotation marks and citations omitted). Lay testimony cannot make connections for the trier of fact based on the witness's expertise. Id.

The Oakley Affidavit clearly "relies on the witness's considerable specialized training, experience, and knowledge" and makes connections based on the witness's expertise. Looking at the spreadsheet information, an untrained layperson could not conclude that the information contained therein could only have gotten there by breaching the password protection and taking something that belonged to plaintiff rather than defendant. To a layperson, defendant's description of what it did (opened up the part of the program which was a database that contained information about its own customers that defendant, itself, owned and then copied this information that belonged to it and transferred it to DSI) would seem pretty straightforward. A layperson is likely familiar with "copying and pasting". The Oakley Affidavit's analysis and explanation as to why the spreadsheet shows it was not the result of "copying and pasting" but

6

rather of taking plaintiff's confidential source code and transferring it to DSI is based on Oakley's specialized knowledge. The Oakley Affidavit does not result "from a process of reasoning familiar in everyday life" but "results from a process of reasoning which can be mastered only by specialists in the field." Id. Plaintiff's attempt to fit the Oakley Affidavit under Rule 701 fails. Rule 701 expressly excludes testimony based on this type of technical or specialized knowledge. Plaintiff was obligated to disclose Oakley as an expert witness under Fed. R. Civ. P. 26(a)(2).

Fed. R. Civ. P. 26(a)(2)(A) requires a party to disclose "the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(C)(i-ii) provides that the disclosure "must state: the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and a summary of the facts and opinions to which the witness is expected to testify." By order [33] dated April 18, 2017, the deadline for Rule 26(a)(2)(C) disclosures was set for August 18, 2017. Plaintiff did not make any Rule 26(a)(2)(C) disclosures by that deadline.

Plaintiff states that in its Rule 26(a)(1) disclosures it disclosed Oakley as someone who "has knowledge regarding all aspects of the contract and the provisions regarding software procedures to be followed upon termination of the contract." Plaintiff supplies the affidavit of its attorney in which the attorney states that following the completion on October 31, 2017 of the deposition of one of plaintiff's employees that plaintiff's counsel informed defense counsel "that he believed that her deponent Jeffrey Cichocki had lied during his deposition in that Row 13 of the Defendant's spreadsheet contained approximately 75 cryptic column headings that were authored by the plaintiff and could only be obtained by defeating the password protection to the Bg.mdb data base." Plaintiff argues citing Rule 26(e)(1)(A) that this was enough to meet plaintiff's obligation to supplement its 26(a) disclosures as that obligation is satisfied when the information has otherwise been made known to the other party during discovery.

If a person is to be an expert witness, the person must be separately disclosed as such even if the person has been disclosed as a fact witness. Musser v. Gentiva Health Services, 356 F.3d 751, 756-57 (7th Cir. 2004). While plaintiff made a 26(a)(1) disclosure of Oakley as a potential fact witness, it never made a 26(a)(2)(A) disclosure of him as a potential expert witness. "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The deadline set by the court for making the expert disclosure and providing the information required by Rule 26(a)(2)(C) was August 18, 2017. Plaintiff failed to meet its obligation to disclose Oakley as an expert witness.

Rule 26(e)(1) provides: "A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court."

7

Plaintiff maintains its counsel's oral statement to defense counsel on October 31, 2017 concerning the Row 13 cryptic column headings satisfied its duty to supplement because this statement showed the information had otherwise been made known to defendant. However, Rule 26(e)(1)(A) presupposes a disclosure has been made ("A party who has made a disclosure . . ."). No 26(a)(2)(A) & (C) disclosures having ever been made, the October 31, 2017 statement cannot be considered to have supplemented them. The statement does not cure the failure to supply the required 26(a)(2)(A) & (C) disclosures by the August 18, 2017 deadline.

Fed. R. Civ. P. 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

Defendant argues excluding the Oakley Affidavit is mandatory under Rule 37(c)(1) citing Musser, 356 F.3d at 758. However, Musser states: "We urge district courts to carefully consider Rule 37(c), including the alternate sanctions available, when imposing exclusionary sanctions that are outcome determinative." Id., at 760. Rule 37(c)(1) provides the court may impose other sanctions "[i]n addition to or instead of" exclusion of the evidence. As the exclusion of the Oakley Affidavit from consideration on this motion for summary judgment could potentially be outcome determinative, the court believes an opportunity should be taken to "carefully consider Rule 37(c), including the alternative sanctions available."

Accordingly, the court denies without prejudice the motion [71] to strike the Oakley Affidavit and refers the matter to the magistrate judge for a determination, after granting the parties an opportunity to be heard, of the appropriate sanctions (which may include exclusion of Oakley's expert testimony) for the failure to disclose Oakley as an expert witness under Rule 37(c) for this Rule 26(a) violation. The magistrate judge should also rule on the other alleged discovery violations raised in defendant's motion to strike. The motion [42] for partial summary judgment is stricken without prejudice to re-filing after determination of the Rule 37(c) sanctions. Prior to the magistrate judge undertaking the foregoing, the parties are directed to contact Magistrate Judge Johnston on or before October 12, 2018 to arrange a settlement conference.

Date: 9/21/2018                  ENTER:

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices. (LC)